David A. Berger (dberger@abv.com)
Michael S. Vogel (mvogel@abv.com)
John S. Craig (jcraig@abv.com)
Lauren J. Pincus (lpincus@abv.com)
ALLEGAERT BERGER & VOGEL LLP
111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

*Counsel to Syncora Guarantee Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                          :
In re:                                    :       Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*  :       08-13555 (SCC)
                                          :
                          Debtors.        :       (Jointly Administered)
                                          :
------------------------------------------------------------x
                                          :
LEHMAN BROTHERS HOLDINGS INC. and         :       Adv. Pro. No. 15-01112 (SCC)
STRUCTURED ASSET SECURITIES               :
CORPORATION,                              :
                                          :
                          Plaintiffs,     :
                                          :
-against-                                 :
                                          :
U.S. BANK NATIONAL ASSOCIATION,           :
SYNCORA GUARANTEE INC., and               :
GREENPOINT MORTGAGE FUNDING, INC.,        :
                                          :
                          Defendants.     :
------------------------------------------------------------x

**SYNCORA GUARANTEE INC.'S MEMORANDUM OF LAW
IN OBJECTION AND OPPOSITION TO THE MOTION BY LEHMAN BROTHERS
HOLDINGS INC. AND STRUCTURED ASSET SECURITIES CORPORATION
FOR AN ORDER STAYING U.S. BANK, N.A., AS INDENTURE TRUSTEE V.
GREENPOINT MORTGAGE FUNDING, INC.**

## Table of Contents

Page

Table of Authorities ................................................................................................................. ii

Preliminary Statement ............................................................................................................. 1

Facts ......................................................................................................................................... 5

    A.     The Securitization ............................................................................................. 5

    B.     The State Action ............................................................................................... 7

    C.     The Syncora Claim ........................................................................................... 9

Argument ............................................................................................................................... 13

I.     THIS COURT MAY EXERCISE ITS DISCRETION TO STAY A
     STATE COURT ACTION BUT SHOULD NOT DO SO HERE .................................. 13

    A.     Mere Delay in Distributing Reserves Does Not Allow for the
            Staying of a Third-Party Action ................................................................... 15

    B.     The Continued Litigation of the State Action Does Not Violate the
            Plan ............................................................................................................... 16

    C.     While the State Action Does Include Certain Common Questions
            of Law and Fact with the Claims, It is Not So Interwoven as to
            Warrant a Stay ............................................................................................. 17

    D.     Lehman Makes No Attempt to Show that the Balance of the
            Equities Favors a Stay of the State Action .................................................. 18

II.    IN THE ALTERNATIVE, ANY STAY OF THE STATE ACTION
     SHOULD EXPIRE ONCE THIS COURT RESOLVES THE STANDING
     ISSUE ....................................................................................................................... 21

Conclusion ............................................................................................................................ 22

## Table of Authorities

Page(s)

<u>Cases</u>

In re AP Indus., Inc.,
117 B.R. 789 (Bankr. S.D.N.Y. 1990) ........................................................................ 13

In re Calpine Corp.,
2007 WL 1302604 (Bankr. S.D.N.Y. 2007) ........................................................ 16, 18

In re Chateaugay Corp.,
201 B.R. 48 (Bankr. S.D.N.Y. 1996) .................................................................... 15, 19

In re Delta Air Lines, Inc.,
608 F.3d 139 (2d Cir. 2010) ....................................................................................... 22

In re Excel Innovations, Inc.,
502 F.3d 1086 (9th Cir. 2007) ............................................................................. 19, 20

In re Integrated Res., Inc.,
157 B.R. 66 (S.D.N.Y. 1993) ..................................................................................... 12

In re Ionosphere Clubs Inc.,
124 B.R. 635 (S.D.N.Y. 1991) ................................................................................... 18

In re Johns-Manville Corp.,
 97 B.R. 174 (Bankr. S.D.N.Y. 1989) ........................................................................ 13

In re Lyondell Chemical Co.,
402 B.R. 571 (Bankr. S.D.N.Y. 2009) ................................................................. 16, 21

In re PTI Holding Corp.,
346 B.R. 820 (Bankr. D. Nev. 2006) ................................................................... 20, 21

In re Saxby's Coffee Worldwide, LLC,
440 B.R. 369 (Bankr. E.D. Pa. 2009) ................................................................. 20, 21

In re South Side House, LLC,
470 B.R. 659 (Bankr. E.D.N.Y. 2012) ....................................................................... 19

In re Third Eighty-Ninth Assocs.,
138 B.R. 144 (S.D.N.Y. 1992) ............................................................................. 16, 17

Ivanhoe Bldg. & Loan Ass'n of Newark, N.J. v. Orr,
295 U.S. 243 (1935) .................................................................................................... 22

MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,
936 N.Y.S.2d 513 (N.Y. Sup. Ct. 2012) .................................................................... 11

Page(s)

Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co.), Inc.,
676 F.3d 45 (2d Cir. 2012)............................................................................. 13

Picard v. Fairfield Greenwich Ltd.,
762 F.3d 199 (2d Cir. 2014)................................................................. *passim*

Retirement Systems of Ala. v. J.P. Morgan Chase & Co.,
386 F.3d 419 (2d Cir. 2004)............................................................................. 17

Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
490 B.R. 59 (S.D.N.Y. 2013)........................................................................... 20

Shearin v. Doe 1 through 10,
2007 WL 4365621 (D. Del. Dec. 11, 2007)..................................................... 20


Statutes

11 U.S.C. § 105(a) ......................................................................................... 4

11 U.S.C. § 1142(b) ................................................................................. 4, 14

28 U.S.C. § 1651(a) ....................................................................................... 17


Other Authorities

2 Collier on Bankruptcy (16th ed.) ¶ 105.03[1][c] ................................. 19, 21

2 Collier on Bankruptcy (16th ed.) ¶ 105.03[2]........................................... 21

N.Y. Insurance Law § 3105 ..................................................................... 11, 12

N.Y. Insurance Law § 3106 ..................................................................... 11, 12


Rules

Fed. R. Civ. P. 65 ................................................................................. 13, 18, 19

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

      Syncora Guarantee Inc. ("Syncora"), by and through its undersigned attorneys, Allegaert Berger & Vogel LLP, respectfully submits this memorandum in objection and opposition to the motion (the "Motion") by Lehman Brothers Holdings Inc. ("LBHI") and Structured Asset Securities Corporation ("SASCO", and together with LBHI, "Lehman") for an order enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan") and staying U.S. Bank, N.A., as Indenture Trustee (the "Indenture Trustee") v. GreenPoint Mortgage Funding, Inc. ("GreenPoint"), an action pending in the Supreme Court of the State of New York, New York County, Index No. 600352/2009 before the Honorable Marcy S. Friedman (the "State Action").

## Preliminary Statement

      As the Second Circuit has explained, the relief sought by Lehman's Motion -- the stay of a state court proceeding between two third-parties -- is "an extraordinary exercise of discretion". See Picard v. Fairfield Greenwich Ltd., 762 F.3d 199, 213 (2d Cir. 2014). This extraordinary relief is not supported by the authorities Lehman cites or by the equities of the situation. To the contrary, the State Action has been pending *since 2009*. Lehman has been aware of the State Action *since at least 2010*, and has participated in it *since at least 2012*. Indeed, Lehman provided documents, affidavits, and deposition testimony in connection with the parties' competing motions for summary judgment, which were argued before Justice Marcy S. Friedman in September 2014. Now, with those motions having been *sub judice* for eight months, Lehman belatedly and inequitably seeks to stay Justice Friedman's consideration of those motions (and the case as a whole), on the theory that this will advance the administration of the estate. Lehman's motion offers little other than speculation in support of this theory, which

presumes that the issues raised in the State Action can be better and more quickly resolved in this Court, despite the substantial investment of resources in the State Action by the parties and Justice Friedman.

*    *    *

In 2006, LBHI organized and sponsored the GreenPoint Mortgage Funding Trust 2006-HE1, Home Equity Loan Asset-Backed Notes, Series 2006-HE1 residential mortgage-backed securitization (the "Securitization"). LBHI created the Securitization by placing $1.8 billion of mortgage loans originated by GreenPoint, and purchased by a Lehman affiliate, into a trust (the "Trust"), which in turn issued a series of notes (the "Notes"). To make the Notes more marketable, Lehman induced Syncora and another financial guarantor to guarantee different two different classes of the Notes.[1] Through this Securitization, Lehman removed the credit risk of the securitized loans from its balance sheet by shifting the risk onto Syncora and the other guarantor. To induce Syncora to take these risks from Lehman on $1.3 billion worth of mortgages, Lehman offered Syncora a variety of information, representations, and warranties on which Lehman would directly be liable. Lehman also provided that the Trust could directly pursue GreenPoint for any breach by GreenPoint of the representations and warranties that it gave when it originally sold the loans to a Lehman affiliate.

To date, GreenPoint has refused to repurchase any loans from the Trust, claiming that the Indenture Trustee lacks standing to directly pursue GreenPoint, despite clear language in the underlying transaction documents (the "Transaction Documents") that conveyed the loans

---

[1] Syncora guaranteed approximately $1.3 billion of the Notes (the "Syncora Insured Notes" and, the holders of such notes, the "Syncora Insured Noteholders"). See Craig Dec. Ex. 1, ProSupp at S-2, S-52-55. Another insurer, CIFG Assurance North America, Inc. ("CIFG"), issued a financial guarantee policy insuring the remaining $500 million of Notes issued by the Trust (the "CIFG Insured Notes" and, the holders of such notes, the "CIFG Insured Noteholders"). Id.

and repurchase rights into the Trust.  The transfer of these repurchase rights was succinctly

summarized by Lehman in the prospectus supplement issued in connection with the

Securitization:

> Each originator has made certain representations and warranties
> concerning the loans originated by it up to the date of the
> applicable sale agreement.  The seller's rights to these
> representations and warranties will be assigned to the depositor
> under a sale and assignment agreement and, in turn, will be
> assigned at the direction of the owner trustee by the depositor to
> the indenture trustee for the benefit of noteholders under the trust
> agreement.

See Declaration of John S. Craig dated June 12, 2015 ("Craig Dec."), Ex. 1, Prospectus

Supplement, dated August 25, 2006 ("ProSupp"), at S-3.  As GreenPoint would have it, the right

to enforce the repurchase remedy never made it to the Trust because Lehman used the "wrong

form" when it assigned the Loans.  But GreenPoint's position is plainly wrong.  As Lehman

makes clear in the Motion, the Transaction Documents expressly transferred the repurchase

rights to the Trust, Motion at ¶¶ 19, 21-24, and Lehman represented that the repurchase rights

were properly so conveyed, id. at ¶ 27 (confirming that "LBHI had represented to U.S. Bank that

it properly assigned contractual rights" to the Trust).[2]

GreenPoint's refusal to honor its representations and warranties led the Indenture

Trustee to initiate the State Action more than six years ago.  Lehman was well aware of the State

Action from at least the beginning of 2010 -- indeed, Syncora attached the operative complaint

from the State Action as exhibit two to its claim (the "Syncora Claim").  See Craig Dec. Ex. 2.

---

[2] In the State Action, GreenPoint argued that Lehman never intended that the repurchase rights be conveyed to the Trust, (see Craig Dec. Ex. 3, Memorandum of Law in Support of GreenPoint's Motion for Summary Judgment, at 3), something not supported by the contemporaneous ProSupp and Transaction Documents themselves, and expressly rejected by Lehman in the Motion.

Further, Lehman has been an active participant -- by providing third-party discovery -- for more than three years.

Despite this more than five years of litigation, Lehman for the first time by its Motion argues that this long pending action violates the Plan and must be stayed pursuant to Sections 105(a) and 1142(b) of Title 11 of the United States Code (the "Bankruptcy Code") and because it violates the Plan. Nowhere in the Motion does Lehman explain why it waited for literally years to seek the extraordinary relief it now does. Nor does Lehman attempt to justify its participation in the State Action that it now wrongly contends violates the Plan and, so, must be stayed.

Lehman's Motion is directed to the equitable powers of this Court, and Lehman's extended delay -- during which time the parties conducted discovery and briefed and argued summary judgment, and during which Justice Friedman has been considering those motions for eight months -- precludes the relief sought in the Motion. Syncora agrees with Lehman that the issue of whether the Indenture Trustee has standing to pursue GreenPoint is related to both the Indenture Trustee's and Syncora's claims against the Lehman estate. Syncora also agrees with Lehman that the risk of inconsistent judgments and considerations of judicial economy may very well have -- at least had Lehman timely moved -- made this Court a proper forum to decide the standing issue. However, despite this Court's broad power under the Bankruptcy Code, at this stage of the State Action, this Court should defer resolution of that action to that court. That court has already invested countless hours, as have the parties to the State Action, to determine the standing issue. At this juncture, Lehman's Motion is far too late to do anything but further burden the parties to the State Action, and will result in none of the claimed efficiencies for resolving the claims by Syncora and the Indenture Trustee against the estate.

## Facts

### A.    The Securitization

Lehman formed the Securitization by aggregating approximately 30,000 loans (the "Loans").  These loans were primarily acquired from GreenPoint, which originated more than 99% of the Loans.  See Craig Dec. Ex. 1, ProSupp at S-3.  The GreenPoint Loans were sold by GreenPoint pursuant to certain "Flow Agreements" and certain Purchase Price and Terms Letters, to a Lehman affiliate, Lehman Brothers Bank, FSB ("Lehman Bank"), using GMAC Mortgage Corporation ("GMAC") as a conduit.  Lehman caused the Loans to be transferred through a series of assignments into the Trust.  Specifically, the Loans were transferred pursuant to the following agreements:  (i) from GreenPoint to GMAC, pursuant to the Flow Agreements (Craig Dec. Exs. 4, 5) and Purchase Price and Terms Letters; (ii) from GMAC to Lehman Bank, pursuant to certain Assignment, Assumption and Recognition Agreements (Craig Dec. Exs. 6, 7); (iii) from Lehman Bank to LBHI pursuant to an Assignment and Assumption Agreement (the "AA Agreement", Craig Dec. Ex. 8); (iv) from LBHI to SASCO pursuant to the Mortgage Loan Sale and Assignment Agreement ("MLSAA", Craig Dec. Ex. 9); and (v) from SASCO to the Trust, pursuant to the Transfer & Servicing Agreement (the "TSA", Craig Dec. Ex. 10).  The Trust then pledged the Loans to the Indenture Trustee pursuant to an Indenture, dated as of August 1, 2006, between the Trust and the Indenture Trustee (the "Indenture", Craig Dec. Ex. 11).  All of the transfers from Lehman Bank through to the Indenture Trustee occurred simultaneously, as of August 1, 2006.



The Securitization issued two classes of notes (along with certain uninsured certificates), each of which was backed by financial guarantee insurance solicited by LBHI. Craig Dec. Ex. 1, ProSupp at S-2, S-5. Syncora guaranteed regularly scheduled payments of principal and interest (subject to certain limitations) to the Syncora Insured Noteholders and CIFG guaranteed regularly scheduled payments of principal and interest (subject to certain limitations) to the CIFG Insured Noteholders. Id.

To induce Syncora to issue the Policy, LBHI provided information, representations, and warranties to Syncora about the Loans and the Securitization. Craig Dec. Ex. 2, Syncora Claim; Craig Dec. Ex. 12, Insurance and Indemnity Agreement dated as of August 28, 2006 (the "I&I Agreement") by and among Syncora, LBHI, SASCO, the Trust, GMAC Mortgage Corporation ("GMAC"), and the Indenture Trustee; Craig Dec. Ex. 9, MLSAA. The information, representations, and warranties provided by LBHI were materially incorrect and did not disclose that the Loans had pervasive defects. See Craig Dec. Ex. 2, Syncora Claim. As a result of this misinformation, Syncora was induced to provide insurance for a transaction it would have otherwise never insured and has suffered hundreds of millions of dollars in damages. Id.[3] Accordingly, Syncora filed Proof of Claim No. 66099 on January 13,

---

[3] Although not relevant here, Syncora has engaged in post-closing transactions with certain Syncora Insured Noteholders to recover a portion of its losses.

2010, in respect of these damages.  Craig Dec. Ex. 2, Syncora Claim.[4]

In addition to the information, representations, and warranties given by LBHI directly to Syncora, Lehman also conveyed (through the above described series of transfers) the repurchase rights against GreenPoint.  GreenPoint made extensive representations and warranties regarding the Loans and their underwriting in the Flow Agreements (see Craig Dec. Exs. 4, 5, Flow Agreements §§ 6, 7), and agreed to repurchase the Loans in the event of a breach.  Id. at § 8.  As detailed in the ProSupp and the Transaction Documents, this right to enforce GreenPoint's repurchase obligations (the "Rights and Remedies") was assigned to the Indenture Trustee along with the Loans and pursuant to the same chain of assignments.  See Craig Dec. Ex. 8, AA Agreement §§ 1, 6(a); Craig Dec. Ex. 9, MLSAA § 1.01(a); Craig Dec. Ex. 10, TSA §§ 2.01(a), 3.03; Craig Dec. Ex. 11, Indenture at 1-2.

### B.    The State Action

The State Action was commenced on or about February 5, 2009, by the Indenture Trustee, Syncora and CIFG.[5]  See Craig Dec. Ex. 13, Complaint.  The Complaint asserted breach of contract causes of action against GreenPoint for breach of its representations and warranties and repurchase obligations in the Flow Agreements.  See id.  GreenPoint moved to dismiss the Complaint in April 2009 on various grounds, but did not raise the issue of the Indenture Trustee's standing in its opening brief; rather, GreenPoint initially contended that the Indenture Trustee "is the Real Party in Interest".  See Craig Dec. Ex. 14, Memorandum of Law in Support of GreenPoint's Motion to Dismiss the Complaint at 24.  Then, in its Reply Memorandum of Law filed on July 1, 2009, GreenPoint for the first time raised the argument that the Indenture

---

[4] This proof of claim amended the original proof of claim filed by Syncora on September 16, 2009, which contained a typographical error as to the amount sought.
[5] Syncora's and CIFG's claims were subsequently dismissed in the State Court Action.  See Craig Dec. Ex. 12, February 24, 2012 Order.

Trustee lacked standing to enforce the repurchase rights, essentially because the interim

assignments allegedly used the wrong form.  See Craig Dec. Ex. 15, Reply Memorandum of Law

in Support of GreenPoint's Motion to Dismiss the Complaint.

On March 3, 2010, the Honorable Bernard J. Fried, who presided over the State

Action before his retirement and transfer of the case to Justice Friedman, declined to dismiss the

Indenture Trustee's claims and permitted discovery to go forward on the issue of standing.  See

Craig Dec. Ex. 16, March 3, 2010 Order.  Lehman was without question aware of this Order as it

submitted a copy as an exhibit to its Objection to Syncora's Proof of Claim filed on September

16, 2011 [Docket No. 200807].

Discovery in the State Action was bifurcated into two phases, with the first phase,

addressing the Indenture Trustee's standing, beginning in 2012.  Throughout the discovery

process, Lehman and its counsel played an active role.  This participation included:

- Production by Lehman of over 1,000 documents (Craig Dec. ¶ 3(a));

- Lehman's counsel representing four former Lehman employees at their
  depositions (Craig Dec. ¶ 3(b)); and

- Providing affidavits from former Lehman employees that were used in
  summary judgment briefing on the standing issue (Craig Dec. ¶ 3(c)).

At no point did Lehman or its counsel contend that the issue of the Indenture Trustee's standing

was more properly heard by this Court.  Nor did Lehman or its counsel assert that the Indenture

Trustee's continued prosecution of the State Action was in violation of the Plan, the

Confirmation Order, or any other order of this Court.

In December 2013 -- after two years of discovery involving 16 depositions in

New York, Massachusetts, California and Texas, and the production of more than 12,500

documents (Craig Dec. ¶ 4) -- GreenPoint and the Indenture Trustee each moved for summary

judgment on the issue of the Indenture Trustee's standing (the "Standing Motions").  Craig Dec.

Exs. 18, 19, Notices of Motion.  Notwithstanding the painstaking description of the assignment

of the repurchase rights set forth in the ProSupp and Transaction Documents, and its earlier

admissions, GreenPoint argued in its motion -- which the Indenture Trustee and Syncora hotly

dispute -- that the "design" of the Securitization was for Lehman Bank to retain the Rights and

Remedies, while the Trust could pursue LBHI for these breaches.

Briefing on the Standing Motions (and related motions) was completed on April

9, 2014 (see Craig Dec. Ex. 20, Docket No. 542).[6]  In connection with these motions, the parties

submitted to the court over 275 exhibits, two affidavits of industry experts, and cross-motions to

strike the testimony of the industry experts.  Oral argument was heard on September 9, 2014

(Craig Dec. Ex. 21, Transcript), and the matter remains *sub judice*.

### C.    The Syncora Claim

Syncora's claim against LBHI arises out of the I&I Agreement, pursuant to which

LBHI offered numerous protections to Syncora and without which Syncora would not have

agreed to issue its Policy.  Craig Dec. Ex. 2, Syncora Claim ¶¶ 7-12.  These include broad

representations and warranties covering not just the Loans but also the Securitization, the

"Operative Documents,"[7] and the various disclosure documents including a Prospectus, dated

August 11, 2006, a Free Writing Prospectus, dated August 22, 2006, and the ProSupp (together,

the "Offering Document"), along with attendant indemnification and reimbursement remedies.

See Craig Dec. Ex. 12, I&I Agreement §§ 2.01, 3.04.

---

[6] In addition to cross-moving for summary judgment, the parties each moved to strike the other's expert affidavits. See Craig Dec Exs. 22, 23, Docket Nos. 520, 522.  The Indenture Trustee further sought to strike certain deposition testimony of Nimish Mathur, a former Lehman Brothers employee, submitted by GreenPoint in connection with its reply papers in further support of its motion for summary judgment.  See Craig Dec Ex. 20, Docket No. 542.

[7] The I&I Agreement defines "Operative Documents" to include the I&I Agreement, the AA Agreement, the MLSAA, the Indenture and the Indemnification Agreement, among others.  See Craig Dec. Ex. 12, I&I Agreement at p. 5.

For example, under Section 2.01 of the I&I Agreement, LBHI represented and warranted as to, among other things:

- The accuracy of all information relating to the Loans provided to Syncora by LBHI, the Trust or SASCO, including the statements made in the "Operative Documents" and the information in the data tape;

- The accuracy of the Offering Document; and

- The accuracy of the representations and warranties of LBHI, the Trust and SASCO in the "Operative Documents."  LBHI, the Trust and SASCO also explicitly made "each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein."

See Craig Dec. Ex. 12, I&I Agreement § 2.01.  Thus, in addition to the myriad of other protections, LBHI incorporated into the I&I Agreement all of the representations and warranties in the Operative Documents -- including Loan-level representations LBHI made in the MLSAA -- and made them directly to Syncora.

LBHI's assurances went not only to the quality of the Loans but to the terms of the Securitization, as well.  For example, by representing to the accuracy of the Offering Document, Lehman represented to Syncora that the description of the Securitization contained therein -- which explicitly provided that the Rights and Remedies were assigned to the Indenture Trustee and could be enforced by it (see, e.g., Craig Dec. Ex. 1, ProSupp at S-8, S-63) -- was accurate.

LBHI backed up these representations and warranties with an agreement to indemnify Syncora in the event of their breach, and in several other additional circumstances, including, for example, for damages arising out of (i) statements, omissions or actions by LBHI or the Depositor in connection with the offering, (ii) the negligence or bad faith of any director, officer, employee or agent of the same in connection with any "Transaction" arising from or relating to the "Operative Documents", or (iii) misstatements or omissions in the Offering

10

Document.  See Craig Dec. Ex. 12, I&I Agreement § 3.04(a).  Thus, LBHI affirmatively

undertook to protect Syncora from both breaches of representations and warranties and

misstatements or omissions in the Offering Document, the I&I Agreement and the MLSAA.

LBHI also undertook to indemnify Syncora for GreenPoint's breaches of the

representations and warranties under the Operative Documents, which include the

Indemnification Agreement among Syncora, GreenPoint, and Lehman Brothers Inc.  Id.  Under

the Indemnification Agreement, GreenPoint represented and warranted that the material it

provided to SASCO for inclusion in the "Offering Document" was materially true and correct.

Craig Dec. Ex. 24, Indemnification Agreement § 5f.  Accordingly, LBHI's broad obligations to

Syncora extended not just to its own misstatements in the Offering Document, but to

GreenPoint's as well.

Further, under the I&I Agreement, Syncora was given the right to reimbursement

for various matters, including Policy payments resulting from the breach by LBHI of its

obligations under the Operative Agreements, and

> any and all charges, fees, costs and expenses that the Insurer may
> reasonably pay or incur, including reasonable attorneys' and
> accountants' fees and expenses, in connection with … the
> enforcement, defense or preservation of any rights in respect of
> any of the Operative Documents, including defending, monitoring
> or participating in any litigation or proceeding (including
> insolvency proceeding in respect of any Transaction participant or
> any affiliate thereof) relating to any of the Operative Documents,
> any party to any of the Operative Documents (in its capacity as
> such party) or the Transaction….

Craig Dec. Ex. 12. § 3.03.[8]

---

[8] The Syncora Claim does not explicitly reference the claims it has against LBHI under New York Insurance Law.
See, e.g., MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 936 N.Y.S.2d 513, 521-22 (N.Y. Sup. Ct. 2012)
(financial guarantee insurer could assert claims under N.Y. Insurance Law Sections 3105 and 3106 against parties
who obtained insurance for securitization based on misstatements), aff'd as modified by, 105 A.D.3d 412 (1st Dep't

As has been detailed extensively in Syncora's previous filings with this Court and in the Complaint, the Offering Document, representations, and warranties were systematically false and Syncora been significantly damaged as a result.  Contrary to Lehman's contention (Motion at ¶ 10), however, Syncora's claim for indemnification and reimbursement in respect of these damages is hardly "substantially identical" to the Indenture Trustee's claim (the "Indenture Trustee Claim", and together with the Syncora Claim, the "Claims").  While the Indenture Trustee has a repurchase claim for certain direct representations and warranties of LBHI made under the MLSAA (see Craig Dec. Exs. 25, 26, Indenture Trustee Proofs of Claim),[9] LBHI's obligation to the Indenture Trustee to repurchase breaching Loans is subject to the MLSAA's limitation, which provides that:

> [t]o the extent that any fact, condition or event with respect to a Loan constitutes a breach of both (i) a representation or warranty of the Transferor under the Transfer Agreements and (ii) a representation or warranty of the Seller [LBHI] under this Agreement, the sole right or remedy of the Depositor [SASCO] with respect to a breach by the Seller of such representation and warranty (except in the case of a breach by the Seller of the representations made by it pursuant to Section 1.04(b)(i)), shall be the right to enforce the obligations of the Transferor under any applicable representation or warranty made by it.

Craig Dec. Ex. 9, MLSAA § 1.04(b).[10]  Equivalent language limiting Syncora's right to recover for LBHI's breach of representations and warranties is not contained in the I&I Agreement.

_____

2013).  Consistent with its reservation of rights, Syncora reserves the right to seek to amend the Syncora Claim to explicitly seek recovery under N.Y. Insurance Law Sections 3105 and 3106.  See Craig Dec. Ex. 2, Syncora Claim ¶ 15 ("Syncora expressly reserves its right to replace, amend or supplement this Proof of Claim to include any other claims at law or in equity."); see also In re Integrated Res., Inc., 157 B.R. 66, 70 (S.D.N.Y. 1993) (amendments are "freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim.").

[9] The Indenture Trustee is an express third-party beneficiary of the MLSAA (Craig Dec. Ex. 9, MLSAA § 2.08) and also received enforcement rights thereunder pursuant to the Indenture (Craig Dec. Ex. 11, Indenture at 1-2).

[10] This language does not, however, have the effect of reducing the Trust Claim to zero, as LBHI asserts (Motion at ¶ 24, n.9).  The MLSAA specifically carves out LBHI's representations and warranties under Section 1.04(b)(i), which are direct obligations of LBHI.  These include that "[e]ach Loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable predatory

On September 16, 2011, LBHI objected to the Syncora Claim and sought to

disallow and expunge it [Docket No. 20087].  A hearing on this objection was adjourned *sine die*

[Docket No. 40945].  Separately, on May 2, 2013, LBHI commenced an adversary proceeding

against Syncora, seeking to disallow and/or subordinate the Syncora Claim [A.P. No. 13-01341

Docket No. 1].  After the parties filed competing summary judgment motions, they agreed to

withdraw their motions and to explore a negotiated resolution, which such negotiations were

unsuccessful.

<u>**Argument**</u>

## I.    THIS COURT MAY EXERCISE ITS DISCRETION TO STAY A STATE COURT ACTION BUT SHOULD NOT DO SO HERE.

Lehman is correct that this Court has the power under Section 105 of the

Bankruptcy Code to enjoin any action that might impact the bankrupt estate.  <u>See</u> <u>Picard</u>, 762

F.3d at 211 (court has authority to enjoin actions that "'pose the specter of direct impact on the

*res* of the bankrupt estate'") (quoting <u>Pfizer Inc. v. Law Offices of Peter G. Angelos (In re</u>

<u>Quigley Co.), Inc.</u>, 676 F.3d 45, 57 (2d Cir. 2012) (alterations in the original).  Using this

authority, courts in this and other circuits have in certain circumstances stayed, or precluded

parties from initiating, state court actions in connection with plan confirmation.  <u>See</u>, <u>e.g.</u>, <u>In re</u>

<u>AP Indus., Inc.</u>, 117 B.R. 789, 802 (Bankr. S.D.N.Y. 1990) (staying acting under Section 105,

"in order to preserve and protect the [d]ebtor's estate and reorganization prospects").[11]  That

---

and abusive lending laws."  Craig Dec. Ex. 9, MLSAA § 1.04(b)(i).  Accordingly, the bulk of the Indenture Trustee
Claim is presumably based upon breaches of these § 1.04(b)(i) representations, as well as representations that were
breached between the time GreenPoint sold the Loans and LBHI securitized them.

[11] Courts issuing injunctions under Section 105 apply either the requirements of Rule 65 of the Federal Rules of
Civil Procedure or through a determination that such an injunction is necessary to stay an action that would
otherwise "defeat or impair [the bankruptcy court's] jurisdiction with respect to a case before it".  <u>In re Johns-</u>
<u>Manville Corp.</u>, 97 B.R. 174, 181 (Bankr. S.D.N.Y. 1989) (enjoining claims brought outside of the procedures
established under reorganization plan).  The Second Circuit has expressly reserved decision on which of these two
standards, the more strenuous Rule 65 standard or the more relaxed <u>Johns-Manville</u> standard, applies.  <u>See</u> <u>Picard</u>,

said, the staying of a third-party action not involving the debtor is "an extraordinary exercise of discretion". Picard, 762 F.3d at 213 (internal citation omitted).[12] The Court should not exercise this "extraordinary" discretion here.

Lehman's three arguments in support of the Court's extraordinary exercise of discretion here are unpersuasive. First, Lehman argues that an injunction is necessary to allow Lehman to administer the estate "efficiently and distribut[e] estate assets promptly". Motion at ¶ 40. Lehman cites no case, however, where the court has exercised its discretion to stay a third-party action for the sole purpose of enabling reserves to be distributed more quickly, which is, of course, all Lehman seeks to do here. See Point I.A, below. Second, Lehman argues that the continued litigation of the State Action violates the Plan. Motion at ¶ 44. It does not, as neither Lehman itself nor the estate is party to the State Action. See Point I.B, below. Third, Lehman argues that the State Action must be stayed because the State Action and the Claims "present common questions of law and fact that should be resolved by this Court." Motion at ¶ 39. While it is true that these cases present certain common issues, it is nonetheless an insufficient reason to stay the State Action, particularly given Lehman's long-time delay. See Point I.C, below. Finally, the equities do not favor the relief sought by Lehman. See Point I.D, below.

---

762 F.3d at 211 (declining to decide, as an issue of first impression, which standard applies, and denying relief because it failed to meet either). Here, regardless of the standard applied, Lehman's longtime failure to seek this Court's intervention before today requires that its Motion be denied.

[12] Lehman further cites Section 1142(b) of the Bankruptcy Code as a basis for the stay it requests, (Motion at ¶ 33), but neither argues that the standard for issuance of an injunction under Section 1142(b) differs from that under Section 105 nor offers any case for such a proposition. Because an injunction staying the State Action cannot be issued under Section 105, the additional citation to Section 1142(b) does nothing to allow Lehman the relief it seeks.

A.    **Mere Delay in Distributing Reserves Does Not Allow for the Staying of a Third-Party Action.**

Lehman's primary argument for why the State Action must be stayed is that an adverse ruling on standing -- namely that the Trust lacks standing to pursue GreenPoint -- would result in both Syncora and the Indenture Trustee having greater claims against Lehman.  Motion at ¶ 43.  As a result, Lehman claims it is unable to release its reserve for these claims pending a result on the standing question in the State Action.  Id. at ¶¶ 40, 44 (complaining that the State Action "is preventing LBHI from administrating the estate efficiently and distributing estate assets promptly").[13]  Of course, this argument begs the question of why Lehman's remedy for the supposed harm of the continuing pendency of the State Action should be to *stay* the State Action -- thus presumably delaying its resolution.  Lehman's theory -- that this Court can decide the issues posed by the State Action faster than Justice Friedman, who has already invested substantial time in the matter -- is purely speculative and, even if it were correct, would not justify a stay of the State Action.

Nowhere does Lehman cite any case for the proposition that a mere delay in the distribution of assets properly reserved by a plan constitutes sufficient ground to stay a state proceeding.  Rather, the cases cited by Lehman stand only for the propositions that a stay may be issued where otherwise third-party litigation (i) threatens to fundamentally undermine the effectiveness of the plan, see, e.g., In re Chateaugay Corp., 201 B.R. at 71 (granting injunction because other cases risk "collaterally attacking" bankruptcy court's order and "threaten to undermine the [p]lan"), (ii) threatens to derail a potential reorganization of the debtor, In re

---

[13] Lehman paints the Claims as seeking "to extract an unwarranted recovery from Lehman".  Motion at ¶ 44.  This is simply false, as Lehman cannot avoid recognizing that its liability on the Claims will increase should it be determined that the Indenture Trustee lacks standing to pursue GreenPoint.  See, e.g., id. at ¶ 27 ("LBHI had represented to U.S. Bank that it properly assigned contractual rights to U.S. Bank on behalf of the Trust"); at ¶ 43 (recognizing that the "sufficiency of LBB's assignment to LBHI may also form the basis for the assertion of additional claims against the estate").

Lyondell Chemical Co., 402 B.R. 571, 592 (Bankr. S.D.N.Y. 2009) (risk that related companies would be forced into liquidation required a minimal stay to allow for reorganization), or (iii) would allow creditors to receive an unwarranted preference, see, e.g., In re Calpine Corp., 2007 WL 1302604 (Bankr. S.D.N.Y. 2007) (third-party action would allow unsecured creditor access to set-off rights of guarantor). Cf., e.g., In re Third Eighty-Ninth Assocs., 138 B.R. 144, 149 (S.D.N.Y. 1992) (in determining not to stay the action against two out of three guarantors, noting that "[t]his is not a back-door attempt to acquire assets of the Debtor, but rather an action on independent obligations of the Guarantors").

Contrary to all of the cases cited by Lehman, Lehman's primary concern here is accelerating payments out of the reserve. While this is a laudable goal, it does not justify the interference with third-party actions that courts have taken in other, more pressing circumstances. Indeed, the very reason for a reserve is to allow for the confirmation of a plan, subject to outstanding and as-yet undetermined liabilities. Here, Lehman has approximately $68 billion in unresolved claims, which are not expected to be resolved before 2018. See Craig Dec. Ex. 27, *$68B in Lehman Bankruptcy Claims Still in Play, GC Says*, Law360.com, June 9, 2015. Together, Syncora and the Indenture Trustee's claims account for less than 3% of this amount, and -- given the pendency of the other claims -- the mere possibility of delay from the State Action's decision on the standing issue cannot warrant the "extraordinary" relief sought by Lehman.

B.     **The Continued Litigation of the State Action Does Not Violate the Plan.**

Lehman also argues that a stay must be imposed because the State Action violates the Plan which was confirmed on December 6, 2011. Motion at ¶ 44. As noted above, at no time in the nearly six years of litigation of the State Action did Lehman ever raise this issue -- even when Lehman itself responded to discovery requests in the State Action, and agreed to

16

provide affidavits that were submitted in support of the Indenture Trustee's position in the cross-

motions for summary judgment on the standing issue.  Nor is Lehman's position supported by

the provisions in the Plan and Confirmation Order that it cites.  The Plan and Confirmation Order

only enjoin lawsuits "against or affecting the Released Parties or the property of any of the

Released Parties".  Motion at ¶ 43.  Neither Lehman nor its property are party to the State

Action.  Instead, in the State Action the Indenture Trustee is pursuing its independent rights to

recover from GreenPoint, which are plainly outside of the Plan's scope.  See Picard, 762 F.3d at

211 (refusing to enjoin lawsuits by creditor against third-party to enforce duties owed by third-

party directly to creditor); In re Third Eighty-Ninth Assocs., 138 B.R. at 149 (allowing suits to

proceed against two out of three guarantors, emphasizing guarantor suits were based "on

independent obligations of the [g]uarantors").[14]

### C.    While the State Action Does Include Certain Common Questions of Law and Fact with the Claims, It is Not So Interwoven as to Warrant a Stay.

Finally, Lehman argues that the State Action must be enjoined because it involves

common questions of law and fact that are "inextricably interwoven" with those of the Syncora

and Indenture Trustee Claims.  Motion at ¶ 45.  Lehman is correct that the Indenture Trustee's

standing to pursue claims against GreenPoint implicates common questions of law and facts

underlying the Indenture Trustee's and Syncora's Claims.  Id. at ¶ 27.  In particular, if the

Indenture Trustee cannot pursue GreenPoint, it would undoubtedly increase Lehman's liability to

---

[14] Because the State Action does not directly affect the Plan or the estate, Lehman's argument that the Court can enjoin Justice Friedman from deciding the standing issue under the All-Writs Act, 28 U.S.C. § 1651(a), because such a judgment would be "violative of this Court's jurisdiction", (Motion at ¶¶ 49-50), must fail.  Moreover, Lehman's primary reasoning for seeking this Court's intervention -- to avoid unnecessary delay in releasing the Plan's reserves (id. at ¶ 40) -- does not provide sufficient grounds to allow for an injunction under the All-Writs Act, see Retirement Systems of Ala. v. J.P. Morgan Chase & Co., 386 F.3d 419, 429 (2d Cir. 2004) ("federal district court, even assuming it has some interest in avoiding delay in its own proceedings, has no interest -- no interest that can be vindicated by the exercise of the federal injunction power -- in being the *first* court to hold a trial on the merits … . [A] district court may not issue an injunction simply to be the first court to reach a judgment and thereby avoid issues of collateral estoppel" (emphasis in original)).

the Indenture Trustee and Syncora.  Lehman is also correct that the involvement of multiple

forums may create the risk of inconsistent judgments.  Id. at ¶ 45.  But these considerations

should not render the work already completed by the Indenture Trustee and GreenPoint, as well

as the work performed by the State Court, a nullity.  Given how far Lehman has allowed the

State Action to progress, the Court should decline to stay that action.

    Nor does this case present the unique facts of those cases cited by Lehman where

a state action was stayed for being inextricably interwoven with a bankruptcy claim.  The stay in

In re Calpine Corp., 2007 WL 1302604 (Bankr. S.D.N.Y. 2007), was required because without a

stay an unsecured claim would have been essentially promoted by virtue of a third-party's set-off

rights.  Likewise, the creditor in In re Ionosphere Clubs Inc., 124 B.R. 635 (S.D.N.Y. 1991), was

attempting to freeze funds held by the debtor in an attempt to obtain a preference for their claims

over those of ordinary unsecured creditors.  Here, while there are common questions before the

state court and this Court, the continuing proceeding of these two actions does not implicate the

efficacy of the this Court's bankruptcy jurisdiction, especially given how far the State Action has

already proceeded.  See Picard, 762 F.3d at 207-08 (actions against third-party not "intertwined"

with bankruptcy claims where resolution of third-party claims "are only factually likely, as

opposed to legally certain, to impact estate property").

   **D.**  **Lehman Makes No Attempt to Show that the Balance of the Equities Favors a Stay of the State Action.**

    As Lehman would have it, the more rigorous standards imposed by Rule 65 are

inapplicable to stays under Section 105.  Motion ¶ 36.  As a result, Lehman makes no attempt to

show in the Motion that the balance of the equities favors granting a stay of the State Action.

However, as noted above, the appropriate standard for issuing an injunction under Section 105

has yet to be determined by the Second Circuit.  See Picard, 762 F.3d at 211-12 (declined to

18

decide the standard); see also In re Excel Innovations, Inc., 502 F.3d 1086, 1094 (9th Cir. 2007)

("The majority of circuits that have reviewed injunctions staying actions against non-debtors

have applied the usual preliminary injunction standard.")  To the extent that the Court requires a

showing that the balance of the equities favor a stay of the State Action, Lehman cannot prevail.

Before issuing an injunction under Section 105, courts routinely look to balance

the potential hardships on the debtor and creditors whose third-party actions are to be stayed, as

well as broader interests of judicial efficiency, and public interest.  See, e.g., In re Chateaugay

Corp., 201 B.R. 48, 71-72 (Bankr. S.D.N.Y. 1996) (issuance under Rule 65 requires a showing

of irreparable harm, a balancing of the hardships in favor of movant, and that the issuance of an

injunction serves the public interest); In re South Side House, LLC, 470 B.R. 659 (Bankr.

E.D.N.Y. 2012) (balancing interests of public, debtor, creditor and the courts).  "The 'balance of

harms' element is arguably the most critical element of a section 105 injunction".  2 Collier on

Bankruptcy (16th ed.) ¶ 105.03[1][c].

Here, very little is served by granting the stay requested by Lehman.  Unlike in

other cases, there is no risk that allowing the State Action to proceed would imperil the plan,

much less a reorganization.  Cf., e.g., In re Chateaugay Corp., 201 B.R. at 72 (public interest

served by possible reorganization of debtor); In re South Side House, LLC, 470 B.R. at 686

(interest of debtor in confirming the plan).  Further, because Lehman has waited so long to make

its Motion, there is little judicial efficiency to be had in staying the State Action, particularly as

the summary judgment motions have been pending sub judice for more than eight months.  As

noted above, the assertion that a stay of the State Action and submission of the standing issue to

this Court would accelerate resolution of that issue is speculative on its face.  Finally, there is

little compelling public interest in this Court staying a state court from deciding a state contract law issue in the forum of the parties' choosing.

In contrast, staying the State Action would be harmful to the Indenture Trustee, because it would lose the ability, even if only temporarily, to enforce a bargained for right. See, e.g., In re Excel Innovations, Inc., 502 F.3d at 1097 (reversing lower courts for ignoring this harm); In re Saxby's Coffee Worldwide, LLC, 440 B.R. 369, 382 (Bankr. E.D. Pa. 2009) (parties have a "substantial interest in 'the enforcement of bargained-for rights'" at time of their choosing) (quoting In re PTI Holding Corp., 346 B.R. 820, 831 (Bankr. D. Nev. 2006)).[15]  This harm is compounded both by the already long duration of the State Action, and Lehman's own participation in the State Action.  See, e.g., In re Saxby's Coffee Worldwide, LLC, 440 B.R. at 382 (noting that delays impair the ability to prosecute claims by "creat[ing] risk of loss of evidence, including the fading of the memory of witnesses") (citing Shearin v. Doe 1 through 10, 2007 WL 4365621, at *2 (D. Del. Dec. 11, 2007)).  Thus, given that the parties to the State Action have already spent years litigating the standing issue, and that there are competing motions for summary judgment on this issue already pending, the balance of the hardships and interests clearly favors that this Court permit the State Action to proceed.[16]

---

[15] By virtue of the more than $500 million in claims paid by Syncora under the Policy, Syncora stands to share in the Indenture Trustee's recovery against GreenPoint under the terms of the TSA's waterfall provisions – giving Syncora a vested interest in the Indenture Trustee's prosecution of the State Action.  See Craig Dec. Ex. 10, TSA § 5.03(b).

[16] Alternatively, for these same reasons Lehman's request to stay the State Action should be barred by laches. Lehman knew of, and even participated in, the State Action for years before bringing this Motion, allowing the parties to the State Action, as well as the Court, to spend countless hours working to resolve an issue that Lehman now wants to take away from Judge Friedman after some eight months of deliberations.  See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 490 B.R. 59, 74 (S.D.N.Y. 2013) aff'd sub nom. Picard v. Fairfield Greenwich Ltd., 762 F.3d 199 (2d Cir. 2014) (holding that the belated application by trustee to stay action was independently barred by laches).

## II.    IN THE ALTERNATIVE, ANY STAY OF THE STATE ACTION SHOULD EXPIRE ONCE THIS COURT RESOLVES THE STANDING ISSUE.

To the extent that this Court were to stay the State Action, that stay should be narrowly tailored and, in particular, should remain in effect only until this Court resolves the standing issue, so as to minimize the burden on the Indenture Trustee.  Here, only the standing issue is common to the Claims and the State Action.  Once the Indenture Trustee's standing to pursue GreenPoint has been resolved, there is no further reason to delay the State Action.

It is black letter law that the Court "has broad powers to shape the injunction so as to minimize the harm to the creditor."  2 Collier on Bankruptcy (16th ed.) ¶ 105.03[1][c]; see also 2 Collier on Bankruptcy (16th ed.) ¶ 105.03[2] ("the bankruptcy court, as a court of equity, has almost plenary discretion in fashioning the injunction so as to maximize protection and minimize prejudice").  In fashioning relief, courts must be aware of, and minimize, the potential harm to parties engaged in litigation with third-parties.  See, e.g., In re Saxby's Coffee Worldwide, LLC, 440 B.R. 369, 380-81 (Bankr. E.D. Pa. 2009) (requiring an expedited plan process to limit the duration of the stay of third-party litigations).  For this reason, when issuing injunctions, courts will often carefully limit the time frame of the injunction, to minimize the prejudice against third-parties and creditors.  Id. at 385-87 (limiting duration of injunction by limiting time to consummate plan); In re PTI Holding Corp., 346 B.R. 820 (Bankr. D. Nev. 2006) (same, plus imposing a hard stop time, so as to minimize the impact on creditors); In re Lyondell Chemical Co., 402 B.R. 571, 595 (Bankr. S.D.N.Y. 2009) (allowing a limited 60 day injunction to mitigate harm to creditors' rights against third-parties).

Lehman is certainly correct when it argues that a finding that the Indenture Trustee lacks standing to pursue GreenPoint would increase Lehman's exposure under the Claims.  Id. at ¶ 43.  Once this standing issue has been resolved, however, the scope of Lehman's

21

liability to Syncora and the Indenture Trustee can be easily fixed.[17]  For this reason, any stay of the State Action should only be in effect until such time that the Court resolves whether the Indenture Trustee has standing to pursue GreenPoint.[18]

### Conclusion

For the reasons set forth above, Lehman's Motion to stay the State Action should be denied, and the Court should grant such other further relief as it deems proper.  In the alternative, should this Court stay the State Action, any such stay should only be in effect until this Court decides whether the Indenture Trustee has standing to pursue its repurchase rights against GreenPoint.

---

[17] Lehman incorrectly argues that the Indenture Trustee and Syncora will have no claim against the estate if it is determined that the Indenture Trustee has standing to pursue GreenPoint.  As noted above, whether the Indenture Trustee has standing to pursue GreenPoint or not, Lehman has substantial liability to Syncora.  See above at Facts, Point C.  That Syncora could recover both through the Trust's claims against GreenPoint and directly from Lehman is no reason to further delay the State Action, as Syncora bargained for and Lehman agreed to these potentially duplicative rights.  See In re Delta Air Lines, Inc., 608 F.3d 139, 149 (2d Cir. 2010) (allowing for duplicative claims because this was the basis of the bargain between the parties before bankruptcy); see also Ivanhoe Bldg. & Loan Ass'n of Newark, N.J. v. Orr, 295 U.S. 243 (1935) (only bar of duplicate recovery is for those recoveries in excess of the total amount of damages suffered by claimant).

[18] Syncora expressly reserves any and all rights: (i) to have any and all final orders in any and all non-core matters entered only de novo review by a United States District Court Judge; (ii) to trial by jury in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto; (iii) to have the reference of this matter withdrawn by the United States District Court in any matter or proceeding subject to mandatory or discretionary withdrawal; and (iv) to rights, claim, actions or defenses, setoffs, recoupments or other matters which Syncora is entitled under any agreements or at law or in equity or under the United States Constitution.

Dated:  June 12, 2014
        New York, New York

Respectfully submitted,

ALLEGAERT BERGER & VOGEL LLP


By:   /s/ David A. Berger
     David A. Berger
     Michael S. Vogel
     John S. Craig
     Lauren J. Pincus

111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550
dberger@abv.com
mvogel@abv.com
jcraig@abv.com
lpincus@abv.com
*Counsel for Syncora Guarantee Inc.*